[Cite as *State v. Wilson*, 2017-Ohio-8219.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | Hon. W. Scott Gwin, P.J. |
| Plaintiff - Appellee | : | Hon. John W. Wise, J. |
| | : | Hon. Craig R. Baldwin, J. |
| -vs- | : | |
| | : | |
| CHARLES WILSON | : | Case No. 2016CA00222 |
| | : | |
| Defendant - Appellant | : | O P I N I O N |


CHARACTER OF PROCEEDING:     Appeal from the Stark County Court
of Common Pleas, Case No. 2016
CR 0767


JUDGMENT:     Affirmed


DATE OF JUDGMENT:     October 16, 2017


APPEARANCES:

For Plaintiff-Appellee                                    For Defendant-Appellant

JOHN D. FERRERO                                    MATTHEW A. PETIT
Prosecuting Attorney                               116 Cleveland Ave., NW, Suite 808
                                                              Canton, Ohio 44702
By: KRISTINE W. BEARD
Assistant Prosecuting Attorney
Appellate Section
110 Central Plaza South, Suite 510
Canton, Ohio 44702-1413

*Baldwin, J.*

**{¶1}** Defendant-appellant Charles Wilson appeals his conviction and sentence from the Stark County Court of Common Pleas on one count of murder. Plaintiff-appellee is the State of Ohio.

### STATEMENT OF THE FACTS AND CASE

**{¶2}** On June 18, 2012, appellant was indicted in Case No. 2012CR0783, in part, on one count of felonious assault. The assault occurred on May 13, 2012 and Regina Ayers was the victim. After the jury found him guilty, appellant appealed his conviction and sentence. This Court affirmed the judgment of the trial court. *State v. Wilson*, 5th Dist. Stark No. 2013 CA 00078, 2014-Ohio-461.

**{¶3}** After Ayers died, the Stark County Grand Jury, on May 3, 2016, indicted appellant on one count of murder in violation of R.C. 2903.02(B), a special felony. At his arraignment on May 13, 2016, appellant entered a plea of not guilty to the charge.

**{¶4}** Thereafter, a jury trial commenced on November 7, 2016. The following testimony was adduced at trial.

**{¶5}** On May 13, 2012, Joseph Lee was with Regina Ayers at Skyline Terrace when the two decided to go to the Hall of Fame Fuel Mart to get some soda. Lee testified that as they were walking down the road talking they heard "fast approaching footsteps from behind us,…." Trial Transcript at 170. According to Lee, a man came from behind and punched Ayers in the ear causing her to fall to the ground. The man then started kicking her while she was on the ground screaming and then punched Lee in the face a few times and stomped on his face before jumping "up and down on the side of her [Ayers'] head like a trampoline." Trial Transcript at 171. Lee testified that the man kept

kicking Ayers in the gut and that, when the man went back to her the second time, she did not say anything.

{¶6} Lee testified that a gentleman came over and told the man who was assaulting them to leave before the police came and that the man then started strolling down Alan Page towards Cherry. He testified that he had never seen their assailant before and that he did not know of any relationship between the assailant and Ayers. At the time, Ayers was bleeding from her ear and struggling to breath. Lee testified that he next saw the man playing with and attempting to bend a stop sign. Paramedics arrived on the scene and took Ayers away. Lee testified that he went to the hospital and had a broken nose and other injuries. He testified that Ayers never regained consciousness after May 13, 2012. Lee identified appellant as the man who had attacked him and Ayers.

{¶7} Detective Victoria Sellers of the Canton Police Department testified that on May 13, 2012, she responded to a felonious assault in the area of Alan Page Drive and Cherry. She testified that when she arrived on the scene, she saw appellant clutching and perhaps trying to twist or bend a stop sign at the corner while four or five people were rummaging through his pockets. The Detective testified that she approached appellant and that "I don't know that he was trying to strike me necessarily,…but at that point his arm kind of went over my head and Officer Nordick kind of jumped over, grabbed him by the head, and we all went to the ground, and ended up in a fight trying to get him handcuffed." Transcript at 192. While all three of them were on the ground, appellant ended up grabbing a child by the legs and the Officers had trouble getting appellant to let go of the child. When asked, Detective Sellers testified that appellant was not responsive to her verbal commands and was not saying anything coherent except for the word or

name "Ray." Trial Transcript at 194. After appellant was handcuffed, he kicked Officer Todd Gillilan in the face causing his eyeglasses to cut his eye. According to the Detective, appellant was not calm and was "[k]ind of jerking around and still actively resisting." Trial Transcript at 195. Detective Sellers testified that his behavior was consistent with someone who was high or on some type of drug.

{¶8}    During cross-examination, Detective Sellers testified that appellant was screaming "Ray" over and over and that otherwise he was babbling incoherently. She testified that he was sweating profusely when at the jail. She further testified that she did not feel that appellant was necessarily trying to assault her. On redirect, the Detective testified that appellant was incoherent until they got to the jail and then was able to answer questions for a few moments. She admitted on recross-examination that appellant was never tested for drugs.

{¶9}    The next witness to testify was Officer Michael Nordick of the Canton Police Department. He testified that as Detective Sellers approached appellant, he saw appellant's arm go back and was not sure whether appellant was getting ready to strike either her or the people around him. He testified that appellant was making incoherent statements while they were arresting him.

{¶10} Dr. Timothy O'Toole, an emergency room doctor at Aultman Hospital, testified that he administered care to Ayers on May 13, 2012 in the ER and that she was not conscious. He testified that she was breathing on her own at the time but was not verbal or responsive to stimuli. Dr. O'Toole testified that Ayers had a collapsed lung and multiple injuries to her head. Ayers also had a subarachnoid hemorrhage and a subdural hemorrhage and suffered edema to the right side of her brain. When asked if the bleeding

on the brain and the swelling of the brain could be fatal, he answered that they could be or could result in permanent injury. Dr. O'Toole further testified that over time, Ayers' brain injury could cause additional problems if she was not responsive and able to get up and move, including pneumonia and bed sores.

{¶11} At trial, Dr. Ashraf Ahmed testified that Ayers was admitted to McCrea Manor House, an extended care facility, on approximately June 22, 2012 and that he was her primary care doctor for a little over five years. He testified that she left the facility on June 28, 2015. Dr. Ahmed testified that Ayers was in a persistent vegetative state due to her traumatic brain injury and her breathing was dependent on a tracheostomy and her feeding was dependent on a feeding tube. According to him, she required 24 hour around the clock care and would have died without the tracheostomy and breathing tube. Ayers was unable to control most of her bodily functions. Dr. Ahmed testified that she never improved during the time that he was caring for her and that she was constantly reliant on medical intervention for survival. He further testified that that, over time, Ayers' traumatic brain injury could cause her health to worsen. On cross-examination, he testified that while Ayers was at McCrea Manor, she was stable and was then transferred to another nursing facility.

{¶12} Dr. Jonathan Lilly testified next. He testified that he was the primary care physician for Ayers at the Golden Living Center, a long-term care facility in West Virginia, where she was admitted on July 28, 2015. He testified that she was a persistent vegetative state and was what they considered a "total care patient." Transcript at 364. While Ayers had three or four hospitalizations while under his care, Dr. Lilly testified that she was stable when she came back into his care. According to Dr. Lilly, two days before

Ayers passed away on December 6, 2015, she was in stable condition.   On December 8, 2015, nurses found Ayers "dusky and pulseless and without vitals." Transcript at 381. Despite attempts at CPR, she died.

{¶13}  Dr. Andrea Orvik, a medical examiner from West Virginia, testified that she performed the autopsy on Ayers and reviewed her medical records. She testified that she determined that the case was a delayed homicide case.   Dr. Orvik testified that she examined Ayers' body and did not observe any recent injuries or illnesses  Dr. Orvik testified that Ayers had a breathing tube, a feeding tube, and a shunt in her brain that drained excess fluids in her brain that were caused by "[r]emodeling changes in her brain that were related to the injuries." Transcript at 426. According to her, Ayers was in an "extraordinary fragile medical condition" that was a terminal condition. Transcript at 428. With respect to Ayers' subdural bleed, Dr. Orvik testified that due to the limited space in the brain, "any extra stuff in there can cause death pretty immediately." Transcript at 442.

{¶14}  Dr. Orvik testified that she saw signs of a history of seizures and numerous infections in Ayers' medical records and that they were a result of her medical condition. She testified that she concluded that Ayers' death was a result of complications from Ayers' traumatic brain injury.  She further testified that there was no evidence of any prolonged illness and that something in Ayers' brain stopped working. The following is an excerpt from her testimony at trial:

{¶15}  Q:  And, again, that's to a reasonable degree of medical certainty?

{¶16}  A:   Yes, Based on the investigatory findings, the scene findings, the condition of the body, the condition of the organs, the medical records, all of this - - all of

this results, in my opinion, being that it's a result of the traumatic brain injury.  There's nothing whatsoever to indicate that it was anything else.

{¶17} Q:  The fact that she was in the persistent vegetative state for about three and half years, does that also bolster your argument that this is how she passed away?

{¶18} A:  I mean, it doesn't - - it doesn't change it - -

{¶19} Q:  Okay.

{¶20} A:  - - persistent vegetative state.  I suppose in a persistent vegetative state, as time passes, you'd be more and more likely to die because it's a terminal condition.

{¶21} Q:  So the longer she's in that state, the more likely - -

{¶22} A:  She's going to die eventually, yes.

{¶23} Trial Transcript at 467-468. Dr. Orvik testified that the medical cause of death was "remote traumatic brain injury with resulting hydrocephalus and persistent vegetative state." Trial Transcript at 478.

{¶24} Appellant testified at trial in his own defense. He testified that, on April 7th or 8th of 2012, he had been hit in the temple with a bottle and ended up in the hospital for a week as a result.  He testified that he had bleeding on the brain and believed that he had a fracture. Appellant testified that he did not know either Lee or Ayers and had no recollection of the assault.

{¶25} Dr. James Pritchard, a former coroner for Stark County, testified on behalf of the defense.  He testified that he reviewed the medical records, autopsy and other evidence concerning Ayers and that based on his training, knowledge and experience, he could not determine the cause of her death. When asked why not, he testified that the autopsy did not state what the immediate cause of death was. He testified that the autopsy

did not say why Ayers had stopped breathing or why her heart stopped and that there were additional tests that could have been performed, but were not.

{¶26} At the conclusion of the trial and the end of deliberations, the jury, on November 9, 2016, found appellant guilty of murder. As memorialized in a Judgment Entry filed on November 18, 2016, appellant was sentenced to 15 years to life in prison. The trial court ordered that appellant serve such sentence concurrent with the 8 year sentence imposed in Case No.2012CR0783 but consecutive to a separate 8 year sentence imposed in such case, for an aggregate sentence of 23 years to life.

{¶27} Appellant now appeals, raising the following assignments of error on appeal:

{¶28} I. APPELLANT'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE.

{¶29} II. APPELLANT WAS DENIED HIS RIGHTS TO DUE PROCESS AND OF ASSISTANCE OF COUNSEL, AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS 10 AND 16 OF THE OHIO CONSTITUTION, BECAUSE HIS TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL.

I

{¶30} Appellant, in his first assignment of error, argues that his conviction for murder was against the manifest weight and sufficiency of the evidence. We disagree.

{¶31} On review for sufficiency, a reviewing court is to examine the evidence at trial to determine whether such evidence, if believed, would support a conviction. *State v. Jenks,* 61 Ohio St.3d 259, 574 N.E.2d 492 (1991). "The relevant inquiry is whether, after

viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Jenks* at paragraph two of the syllabus, following *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). See also, *State v. Thompkins*, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541. The granting of a new trial "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Martin* at 175.

**{¶32}** We note the weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230, 237 N.E.2d 212 (1967). The trier of fact "has the best opportunity to view the demeanor, attitude, and credibility of each witness, something that does not translate well on the written page." *Davis v. Flickinger*, 77 Ohio St.3d 415, 418, 1997–Ohio–260, 674 N.E.2d 1159.

**{¶33}** Appellant, in the case sub judice, was convicted of the murder of Regina Ayers in violation of R.C. 2903.02(B). Such section states that "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code." The indictment specified that the underlying offense of violence was felonious assault in violation of R.C.

2903.11(A)(1). Pursuant to such section, "[n]o person shall knowingly do either of the following: (1) Cause serious physical harm to another or to another's unborn;.."R.C. 2901.22(B) defines knowingly as follows: "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist."

{¶34} Appellant initially argues that his conviction is against the manifest weight and sufficiency of the evidence because appellee did not prove beyond a reasonable doubt that he "knowingly" committed felonious assault against Ayers. Appellant specifically contends that there was testimony at trial that he was in an altered mental state and was incoherent on the day in question and that the testimony of the two Officers corroborates his own testimony that he had no recollection of the assault due to previous head and brain injuries.

{¶35} However, in the underlying felonious assault case, appellant filed a written notice of plea of not guilty by reason of insanity and a second plea of not guilty by reason of insanity and requested a neuropsychological competency evaluation. The trial court granted appellant's request for evaluation on September 18, 2012. Appellant stipulated to the competency evaluation on February 11, 2013 and was found competent to stand trial. As noted by appellant's trial counsel in the case sub judice, appellant was "evaluated by Dr. Swales in the prior case regarding this incident, and was determined to have been competent and sane; and, therefore, his testimony would not be relevant in this matter…" Trial Transcript at 25. "[T]he doctrine of the law of the case * * * establishes that the 'decision of a reviewing court in a case remains the law of that case on the legal questions

involved for all subsequent proceedings in the case at both the trial and reviewing levels.' " *Pipe Fitters Union Local No. 392 v. Kokosing Constr. Co., Inc.,* 81 Ohio St.3d 214, 218, 1998-Ohio-465, 690 N.E.2d 515, quoting *Nolan v. Nolan* , 11 Ohio St.3d 1, 3, 462 N.E.2d 410 (1984). We find that the law of the case doctrine applied to the felonious assault conviction.

**{¶36}** Moreover, in *State v. Poppelriter*, 7th Dist. Mahoning No. 14 MA 170, 2015-Ohio-4822, 50 N.E.3d 270, the appellant, who was convicted of aggravated menacing, argued that the weight of the evidence did not support a finding that he had acted knowingly because there was evidence he had experienced a mental episode at the time of the offense. The Court, in rejecting such argument, stated, in part, as follows at paragraphs 31-34:

> Appellant's position is akin to a diminished capacity argument. The concept of diminished capacity is that mental illness prevented the defendant from forming a specific mental state that is an element of the offense. See, e.g., State v. Curry, 45 Ohio St.3d 109, 111, 543 N.E.2d 1228 (1989).

> By way of comparison, the concept of legal insanity is an affirmative defense that exists independent of the existence of the elements of the offense. Id. at 111–112, 543 N.E.2d 1228. An affirmative defense, such as insanity, represents a "confession and avoidance," whereby the defendant admits the elements of the crime but seeks to prove some additional fact that absolves the defendant of guilt. A defendant can be found "not guilty by reason of insanity" only if he proves that at the time of the commission of

the offense, he "did not know, as a result of a severe mental disease or defect, the wrongfulness" of his acts. R.C. 2901.01(A)(14), citing R.C. 2901.05 (placing the burden on the defendant to show an affirmative defense by a preponderance of the evidence).

No insanity defense was pled or presented in this case. Rather, Appellant is arguing that the jury should have weighed the evidence and concluded that his mental disorder precluded him from forming the mens rea of knowingly. His argument appears to be the "functional equivalent" of a diminished capacity defense. See State v. Fulmer, 117 Ohio St.3d 319, 2008-Ohio-936, 883 N.E.2d 1052, ¶ 69, citing State v. Fulmer, 11th Dist. No. 2005–L–137, 2006-Ohio-7015, 2006 WL 3833870, ¶ 42 (Westcott Rice, J., dissenting). However, Ohio does not recognize the defense of diminished capacity. Fulmer, 117 Ohio St.3d 319, 883 N.E.2d 1052, at ¶ 66. This means if a defendant does not raise an insanity defense, then he cannot offer testimony that he lacked the mental capacity to form the specific mental state, such as knowingly, required for a particular case. Id. at ¶ 60–61, 64–65, 67, 69–70.

**{¶37}** In the case sub judice, appellant did not raise an insanity defense and, therefore, cannot argue now that he lacked the mental capacity to form the specific mental state of knowingly. Furthermore, based on the evidence adduced at trial, we find that the evidence was sufficient to establish that appellant knowingly caused Ayers to suffer serious physical harm and that the jury did not lose its way in so finding. There was testimony that appellant came up from behind Ayers, punched her in the ear and then

when she was on the ground screaming "I'm a lady, please stop", started kicking her. Trial Transcript at 171. After punching Lee, appellant then returned to Ayers and jumped up and down on her head and kicked her in the gut. He later resisted attempts to put him into the paddy wagon.

{¶38} Appellant next argues that his conviction for murder was against the manifest weight and sufficiency of the evidence because appellee failed to prove beyond a reasonable doubt that the death of Regina Ayers was a proximate result of the felonious assault. Appellant notes that Dr. Pritchard, a defense witness, testified that he was unable to determine the cause of her death to a reasonable degree of medical certainty and that he testified that there were additional tests that could have been performed, but were not.

{¶39} As is stated above, Dr. Orvik, who performed the autopsy, testified that Ayers' death was a result of traumatic brain injury. While Dr. Pritchard, who had never performed an autopsy, testified that Dr. Orvik should have performed microscopic examination of tissue, Dr. Orvik testified that in Ayer's case, "it's not going to tell us anything whatsoever. And I can see the changes grossly so its's unnecessary. Trial Transcript at 451. She testified that she would not have received any information by doing microscopic slides. While the two physicians came to differing conclusions the jury, as trier of fact, was in the best position to access their credibility. Moreover, as noted by appellee, Dr. Orvik's testimony was "consistent with the evidence presented and conclusions of other medical professionals that Ayers' traumatic brain injuries would eventually be fatal."

{¶40} Based on the foregoing, we find that appellant's conviction for murder was not against the manifest weight or sufficiency of the evidence. We find that, construing

that evidence in  a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime of murder proven beyond a reasonable and that the jury did not lose its way in convicting appellant of murder.

**{¶41}** Appellant's first assignment of error is, therefore, overruled.

II

**{¶42}** Appellant, in his second assignment of error, maintains that he received ineffective assistance of trial counsel.

**{¶43}** The test for ineffective assistance claims is set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See, also State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). There is essentially a two-pronged analysis in reviewing a claim for ineffective assistance of counsel. First, the trial court must determine whether counsel's assistance was ineffective; i.e., whether counsel's performance fell below an objective standard of reasonable representation and was violative of any of his or her essential duties to the client. If the court finds ineffective assistance of counsel, it must then determine whether or not the defense was actually prejudiced by counsel's ineffectiveness such that the reliability of the outcome of the trial is suspect. This requires a showing there is a reasonable probability that but for counsel's unprofessional error, the outcome of the trial would have been different. *Id.*

**{¶44}** In order to warrant a finding trial counsel was ineffective, the petitioner must meet both the deficient performance and prejudice prongs of *Strickland* and *Bradley.*

**{¶45}** Appellant specifically argues that his trial counsel was ineffective in failing to contact witnesses that appellant wanted to call to testify as to his previous brain injury and his mental state on May 13, 2012.  Prior to voir dire, appellant indicated to the trial

court that he wanted to call witnesses at trial who could testify as to his mental state. After the jury was excused for deliberations, appellant informed the trial court that he had provided his attorney with the names and addresses of people who he wanted to have testify on his behalf at trial and that his trial counsel never contacted such witnesses. Appellant now contends that his trial counsel was ineffective in failing to contact such witnesses and that the outcome of his trial would have been different if these witnesses had testified.

**{¶46}** However, based on our discussion of and disposition of appellant's first assignment of error, appellant's second assignment of error is overruled.

**{¶47}** Accordingly, the judgment of the Stark County Court of Common Pleas is affirmed.

By: Baldwin, J.

Gwin, P.J. and

John Wise, J. concur.